UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| James Keenan, Luke Hoffman, Stephen Hoffman, and Benedict Hoffman, | File No. 19-cv-1272 (ECT/JFD) |
| Plaintiffs,[1] | |
| v. | **OPINION AND ORDER** |
| Holy See *(State of Vatican City; The Vatican)*, | |
| Defendant. | |

Jeffrey R. Anderson, Michael G. Finnegan, Elin Lindstrom, and Taylor Stippel, Jeff Anderson & Associates P.A., St. Paul, MN, for Plaintiffs James Keenan, Luke Hoffman, Stephen Hoffman, and Benedict Hoffman.

Alexis Ivar Haller, Law Office of Alexis Haller, Aptos, CA; Jeffrey Stanley Lena, Law Office of Jeffrey S. Lena, Berkeley, CA; Jennifer Bruno, Law Office of Jennifer Bruno, Soquel, CA; Aaron G. Thomas and Charles B. Rogers, Taft, Stettinius & Hollister LLP, Minneapolis, MN, for Defendant Holy See.

The four Plaintiffs in this case suffered sexual abuse committed against them in the United States by Roman Catholic priests, and they seek to recover damages from the Holy See, a sovereign nation located in the Vatican City State, Italy, and the supreme body of government of the Roman Catholic Church. "The Foreign Sovereign Immunities Act provides that foreign nations are presumptively immune from the jurisdiction of United

---

[1]     Plaintiff Manuel Vega was terminated from this action on March 2, 2023, pursuant to a notice of voluntary dismissal. ECF No. 80; *see generally*, Dkt. The Holy See had sought dismissal of Vega's claims for improper venue. ECF No. 67; ECF No. 69 at 52–55 (ECF pagination). Vega's dismissal takes the Holy See's venue challenge off the table.

States courts.  The statute, however, sets forth several specific exceptions." *Fed. Republic of Ger. v. Philipp*, 141 S. Ct. 703, 707 (2021).  Plaintiffs here contend that two of these exceptions—one covering commercial activities and the other covering tortious acts—apply to authorize federal jurisdiction over the case, and they assert numerous claims under Minnesota law and one claim under international law.

The Holy See has moved to dismiss the case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Under Rule 12(b)(1), the Holy See argues that the Foreign Sovereign Immunities Act (or "FSIA") deprives the Court of subject-matter jurisdiction to adjudicate Plaintiffs' claims.  Under Rule 12(b)(6), the Holy See argues that Plaintiffs' claims are barred by statutes of limitations and, alternatively, fail on their merits.  The motion raises several legal questions.  A handful of federal courts have addressed some of these questions in cases brought by child sex-abuse survivors against the Holy See, and they have reached different results.

Here, the Holy See's Rule 12(b)(1) motion will be granted, and the Complaint will be dismissed for lack of subject-matter jurisdiction.  There are three case-dispositive conclusions: (1) that Plaintiffs do not plausibly allege Article III standing to assert claims for injunctive relief; (2) that Plaintiffs do not plausibly allege a claim within the FSIA's commercial-activity exception; and (3) that although Plaintiffs plausibly allege claims within the FSIA's tort exception, all of Plaintiffs' claims fall within the tort exception's "discretionary function" and "misrepresentation" carveouts.  Though not essential to the outcome, this order addresses other jurisdictional issues raised by the parties.  Efficiency interests favor informing the parties how these issues, if they mattered, would be decided.

2

I[2]

A

The Holy See, a sovereign nation located in the Vatican City State, Italy, is "the ecclesiastical, governmental, and administrative capital of the Roman Catholic Church and seat of the Supreme Pontiff." Compl. [ECF No. 1] ¶¶ 6, 15. The Holy See creates archdioceses, dioceses, and ecclesiastical provinces of the Church throughout the world. *Id.* ¶¶ 15, 34.

Plaintiffs, now adults, each suffered sexual abuse as children committed by Roman Catholic priests assigned to parishes in archdioceses in the United States. Father Curtis Wehmeyer abused Plaintiffs Luke, Stephen, and Benedict Hoffman. Father Thomas Adamson abused Plaintiff James Keenan.

B

Father Curtis Wehmeyer was ordained as a priest in the Archdiocese of St. Paul and Minneapolis in 2001 and was assigned to the Church of the Blessed Sacrament in St. Paul, Minnesota, from 2006 to 2012. *Id.* ¶¶ 158, 167–68. Prior to and during his assignment to the Church of the Blessed Sacrament, Wehmeyer took part in several incidents of sexual misconduct or suspected misconduct. In 2004, Wehmeyer was cited for loitering in a Minnesota park "that was a known location for men to meet for anonymous sexual

---

[2] The facts described in Part I are drawn entirely from the Complaint. To be clear, the Holy See relies on documents beyond the Complaint to support its motion. Nothing in these documents, however, is essential to understanding the case's basic factual background. Whether some or all of these documents may properly be considered in adjudicating the Holy See's motion is analyzed later.

encounters." *Id.* ¶ 161. That same year, an employee at the Catholic school where Wehmeyer then worked reported to the pastor that she had observed Wehmeyer leaving the students' restroom and that a student had told her that Wehmeyer was in the students' restroom "all the time." *Id.* ¶ 162. The employee again observed Wehmeyer using the boys' restroom after the pastor instructed him not to and, along with another employee, again expressed concerns to the pastor. *Id.* ¶ 163. The employees and the pastor met with Archbishop Harry Flynn, who told them that Wehmeyer would receive counseling. *Id.* In May 2004, Wehmeyer approached two "younger-looking" men at a bookstore in Roseville, Minnesota, looking for "contacts" and tried to engage them in conversation about "sexual matters." *Id.* ¶ 164. Following that incident, Wehmeyer was sent to St. Luke Institute, a facility for sexually offending priests, where he was diagnosed with a sexual disorder. *Id.* ¶ 165. In February 2006, Wehmeyer was "placed on a monitoring program for problem priests in the [Archdiocese]." *Id.* ¶ 166.

Four months later, Archbishop Flynn assigned Wehmeyer to the Church of the Blessed Sacrament in St. Paul, Minnesota. *Id.* ¶¶ 167–68. In July 2006, a local sheriff's deputy informed an Archdiocesan official, Father Kevin McDonough, that he thought Wehmeyer "was exhibiting signs of sex addiction" and the deputy "wanted to alert the Archdiocese." *Id.* ¶ 170. Wehmeyer had been stopped by law enforcement officers in a St. Paul park "known as a place where men seek anonymous sexual encounters" and had been seen in the park again later that night and the next day. *Id.*

In May 2008, Archbishop John Clayton Nienstedt replaced Archbishop Flynn and was provided with information about Wehmeyer's history. *Id.* ¶ 171. In June 2009,

Nienstedt promoted Wehmeyer to pastor of the Church of the Blessed Sacrament and a second parish, despite warnings from another priest, Father Peter Laird. *Id.* ¶ 172. A few months later, Wehmeyer was arrested for driving under the influence after an employee at a gas station reported that Wehmeyer was at the station "intoxicated and talking inappropriately to teenagers." *Id.* ¶ 173. After the incident, Laird contacted the Vicar General of the Archdiocese to express concerns that Wehmeyer was a "predator." *Id.* ¶ 174. Wehmeyer apologized to Nienstedt for his arrest, and Nienstedt wrote in a memo that it was "a good lesson" for Wehmeyer and that he was "repentant." *Id.* ¶ 175. Later investigation revealed multiple allegations of sexual misconduct against Nienstedt as well as an "unusual social relationship" between Nienstedt and Wehmeyer that "may have affected [his] judgment with regard to decisions made about [] Wehmeyer." *Id.* ¶¶ 186–97; *see id.* ¶¶ 201–04.

Plaintiffs Luke, Stephen, and Benedict Hoffman were parishioners at the Church of the Blessed Sacrament. *See id.* ¶¶ 167, 213. Wehmeyer groomed and sexually abused the Hoffmans at various times between 2006 and 2012. *Id.* ¶¶ 167–68, 178–80. In the fall of 2009, Laird expressed concern to the Vicar General of the Archdiocese, that, among other things, Wehmeyer had taken the Hoffmans camping with him during the previous summer. *Id.* ¶ 174. In 2010, a second priest reported to Archdiocesan officials that he had seen Wehmeyer in bed with one of the Hoffmans during a different camping trip. *Id.* ¶ 176.

On June 8, 2012, the Hoffmans' mother reported to law enforcement that at least two of her sons had been sexually abused by Wehmeyer. *Id.* ¶ 181. Three days later, Archdiocesan officials contacted police. *Id.* ¶ 182. Wehmeyer was arrested and charged.

*Id.* ¶¶ 183–84.  He subsequently pleaded guilty to twenty charges of criminal sexual abuse and possession of child pornography and was sentenced to five years of imprisonment. *Id.* ¶ 184.  In June 2015, the Ramsey County Attorney's Office criminally charged the Archdiocese with endangering the safety of the Hoffmans, but it later dropped the charges in exchange for an admission of wrongdoing by the Archdiocese.  *Id.* ¶¶ 198, 200.

C

Father Thomas Adamson was ordained as a priest in the Diocese of Winona, Minnesota, in 1958 and worked at Risen Savior Catholic Church in Apple Valley, Minnesota, from about 1981 to 1985. *Id.* ¶¶ 235, 238.  Before he was assigned to Risen Savior Catholic Church, Adamson had a significant history of sexual misconduct. Plaintiffs allege that the Winona Diocese "knew or should have known" that Adamson "sexually abused minor boys as early as 1963." *Id.* ¶ 240.

Adamson was transferred to different parishes in the Winona Diocese before he was assigned to the Archdiocese of St. Paul and Minneapolis in 1975.  *Id.*  Adamson received psychiatric treatment and counseling for sexually abusing minors, but he was not prohibited from ministering to children. *Id.* ¶ 241.  In about 1977, Adamson was arrested for sexually assaulting a sixteen-year-old boy but "remained in the ministry" and was transferred to a different parish. *Id.* ¶ 242.  In about 1980, another priest informed Archdiocesan officials that Adamson had sexually abused a male minor.  *Id.* ¶ 243.  Adamson underwent psychiatric evaluation and treatment after this incident. *Id.*  Adamson was then transferred to Risen Savior Catholic Church and "instructed to have no contact with youth," but Plaintiffs allege that he instead had "unsupervised and unlimited access to children" at the

6

parish. *Id.* ¶¶ 243–46. Plaintiff James Keenan was a parishioner at Risen Savior Catholic Church. *Id.* ¶¶ 238, 252. Adamson sexually abused Keenan in 1981. *Id.* ¶ 239.

D

Plaintiffs allege that the Holy See "has known about the widespread problem of child sexual abuse committed by its clergy for centuries but has covered up that abuse and thereby perpetuated the abuse" and that the Holy See's actions were "a substantial factor in bringing about [their] abuse." *Id.* ¶¶ 57–61; *see id.* ¶¶ 82–145. To support these general assertions, Plaintiffs allege many more particular facts regarding the Holy See's control of the worldwide Catholic Church and the Holy See's historical knowledge of childhood sexual abuse by Catholic clergy.

Regarding control, Plaintiffs allege, for example, that the "Holy See has unqualified power over the Catholic Church including each and every individual and section of the church including, but not limited to, all priests, [b]ishops, [a]rchbishops, [m]etropolitans, [c]ardinals, and all other church workers, as well as dioceses, archdioceses, ecclesiastical provinces, and orders." *Id.* ¶ 15. The Holy See creates clerical positions and decides who will be appointed to fill them. *Id.* ¶ 46. It "oversees and controls the admissions requirements and curricula [at Catholic seminaries] to ensure that candidates are properly prepared." *Id.* ¶ 33. And it "requires its divisions to write detailed reports about the status of the operation including, but not limited to, personnel issues, finances, and real estate holdings." *Id.* ¶ 32.

Plaintiffs allege that "[t]he problem of child sexual abuse committed by Roman Catholic clerics and others within [the] Holy See's control is almost as old as the Roman

7

Catholic Church itself." *Id.* ¶ 53.  The "first formal legislation" regarding the problem was enacted in the year 306.  *Id.*  An eleventh-century work authored by a Catholic cleric, Father Peter Damien, "encouraged punishment of priests and clerics who sexually molested and abused children, particularly boys." *Id.* ¶ 54.  In a 1917 codification, the Holy See enacted "rules and regulations specifically [forbidding] priests and clerics from having sexual relationships with children under the age of 16." *Id.* ¶ 55.  A document the Holy See "released" in 1922 addressed "cases of solicitation of sex in the confessional." *Id.* ¶ 83. And a 1962 document, the *Crimen sollicitationis*, "contains mandatory and specific instructions regarding the handling of child sex abuse by clergy." *Id.* ¶ 85.  Also in 1962, a Catholic cleric in the United States authored a report to the Holy See regarding "the various types of sexual problems of priests, including sexual abuse of minors[,]" "and on August 27, 1963, submitted a report to the Supreme Pontiff at the Supreme Pontiff's request." *Id.* ¶¶ 88–89.

E

The Complaint asserts fourteen causes of action.  These include claims for: (1) nuisance under Minnesota common law and Minn. Stat. § 609.74, *id.* ¶¶ 265–78; (2) nuisance under Minn. Stat. § 561.01, *id.* ¶¶ 279–85; (3) breach of contract, *id.* ¶¶ 286–98; (4) breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 299–302; (5) violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*, *id.* ¶¶ 303–16; (6) violation of the Minnesota False Statement in Advertisement Act, Minn. Stat. § 325F.67, *id.* ¶¶ 317–19; (7) intentional infliction of emotional distress, *id.* ¶¶ 320–22; (8) violation of customary international law of human rights, *id.* ¶¶ 323–26;

8

(9) an injunction requiring public release of sex offenders' names, *id.* ¶¶ 327–31; (10) an injunction requiring public release of documents regarding those accused of sexually molesting children, *id.* ¶¶ 332–36; (11) a broad injunction proscribing child sexual abuse and requiring ongoing federal-court monitoring, *id.* ¶ 337; (12) negligence with respect to the Hoffmans, *id.* ¶¶ 338–40; (13) negligent supervision with respect to the Hoffmans, *id.* ¶¶ 341–42; and (14) negligent retention with respect to the Hoffmans, *id.* ¶¶ 343–44.

This is the case's second round of Rule 12 motions.  On July 20, 2020, the Holy See filed its first Rule 12 motion seeking dismissal on the grounds of insufficient service of process, lack of personal jurisdiction, improper venue, lack of subject-matter jurisdiction under the FSIA, lack of subject-matter jurisdiction under Article III of the United States Constitution, and failure to state a claim upon which relief may be granted.  ECF No. 21. That motion was granted, but only insofar as it challenged service of process.  ECF No. 39. Plaintiffs subsequently served process on July 26, 2022.  ECF No. 64.  That brings us to the Holy See's present motion to dismiss.  ECF No. 67.[3]

---

[3]     The lengthy time it has taken for the case to reach this stage deserves explanation. Plaintiffs filed their Complaint on May 14, 2019, or more than four years ago.  ECF No. 1. Because of the time Plaintiffs required to serve process, the Holy See first entered its appearance in the case more than one year later, in June 2020.  *See* ECF Nos. 10–14.  The Holy See filed its first Rule 12 motion in July 2020, ECF No. 21, but owing to a series of extensions requested by the parties, the motion was not fully briefed until December 7, 2020, *see* ECF Nos. 28–36.  A hearing on the Holy See's motion was held December 14, 2020.  ECF No. 38.  The order granting the Holy See's motion based on insufficient service of process was entered February 22, 2021.  ECF No. 39.  Plaintiffs thereafter requested and obtained a series of extensions of time to attempt service of process on the Holy See a second time.  *See* ECF Nos. 42–47, 49–63.  The Holy See next entered an appearance on August 30, 2022, ECF No. 64, and filed the current Rule 12 motion on October 28, 2022, ECF No. 67.  The parties again agreed to an extended schedule under which briefing on

II

A

A court reviewing a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) must first determine whether the movant is making a "facial" attack or a "factual" attack. *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015); *see Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) ("[A] motion to dismiss for lack of jurisdiction under the FSIA is no different from any other motion to dismiss on the pleadings for lack of jurisdiction, and we apply the same standards in evaluating its merit.").

A party advancing a facial attack accepts the truth of the operative pleading's jurisdictional allegations. *Branson Label, Inc.*, 793 F.3d at 914. In analyzing a facial attack, a court "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted). In analyzing a facial attack, a court also may consider "other materials necessarily embraced by the pleadings," as a court would in adjudicating a Rule 12(b)(6) motion. *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 715 (8th Cir. 2017); *see Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016). "In general, materials embraced by the complaint include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings."

---

this motion was not completed until April 13, 2023. *See* ECF Nos. 75, 81, 82, and 85. A hearing on the motion was held on April 17, 2023. ECF No. 86.

*Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (internal quotation marks and citation omitted). Courts "additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Id.* (internal quotation marks and citations omitted).

A party advancing a factual attack, on the other hand, relies on evidence beyond the operative pleading. *Branson Label, Inc.*, 793 F.3d at 914–15. In adjudicating a factual attack, the reviewing court may resolve disputed facts, applying no presumption of truth to the nonmoving party's allegations or evidence (or, for that matter, to the moving party's evidence). *Id.*; *see Osborn*, 918 F.2d at 729–30 & n.6.

Here, the Holy See advances a facial attack, though why this is so warrants clarification. The Holy See says that it accepts the truth of the Complaint's jurisdictional allegations. ECF No. 69 at 21.[4] At the same time, the Holy See filed and relies on numerous documents to support its jurisdictional arguments. These documents include certified copies of incorporation documents of the archdioceses and parishes where Wehmeyer and Adamson were assigned when they abused Plaintiffs, an English translation of the *Crimen sollicitationis*, filings from cases cited in the parties' briefing, the Archdiocese of St. Paul and Minneapolis's bankruptcy reorganization plan, and a Bankruptcy Court order approving that plan. *See* ECF Nos. 71-1–71-9, 83-1–83-5. Each

---

[4]   Unless noted otherwise, citations are to ECF pagination (appearing at the top, right corner of each page) and not to a document's original pagination.

of these documents falls in a category of materials that appropriately may be considered in deciding a Rule 12(b)(6) motion—and, hence, in deciding a Rule 12(b)(1) facial challenge to subject-matter jurisdiction.  The incorporation documents and court filings are matters of public record, *see Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008) (affirming district court's consideration of a financing statement on file with the State of Minnesota because it was "a public record that can be considered even if not mentioned expressly in the pleadings"), and their authenticity is not disputed.[5]  The contents of the *Crimen sollicitationis* are alleged in the Complaint.

For these reasons, then, the Holy See properly relies on these materials to support its facial challenge, and the familiar Rule 12(b)(6) standards apply.  The factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in Plaintiffs' favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted).  Although the factual allegations need not be detailed, they must be sufficient "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[5]     Other reasons may justify not considering some of these documents.  For example, Plaintiffs argue that the Holy See's reliance on briefing it filed in another case is just an end run around the already extended word-count limits governing the Holy See's motion. *See* ECF Nos. 18, 85 at 4.  If necessary, these other issues will be considered separately.

B

1

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in" United States courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989); *see* 28 U.S.C. § 1330 ("[D]istrict courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.").

A foreign sovereign is "presumptively immune" from suit. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Fed. Republic of Ger.*, 141 S. Ct. at 709 ("The [FSIA] creates a baseline presumption of immunity from suit."); *see* 28 U.S.C. § 1604. "[U]nless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Nelson*, 507 U.S. at 355 (citations omitted); *see* 28 U.S.C. §§ 1605–07 (delineating exceptions to the jurisdictional immunity of a foreign state). Here, the parties do not dispute that the Holy See is a foreign state and therefore enjoys the FSIA's immunity presumption. *See* Compl. ¶ 15; *see also O'Bryan v. Holy See*, 556 F.3d 361, 372–74 (6th Cir. 2009).

"Once a foreign state makes a prima facie showing of immunity, the plaintiff seeking to litigate in the United States then has the burden of showing that an exception applies." *Cmty. Fin. Grp., Inc. v. Republic of Kenya*, 663 F.3d 977, 980 (8th Cir. 2011)

13

(quoting *Gen. Elec. Cap. Corp. v. Grossman,* 991 F.2d 1376, 1382 (8th Cir. 1993)).[6]

Plaintiffs seek to establish subject-matter jurisdiction under the FSIA through two exceptions: the commercial activity exception, 28 U.S.C. § 1605(a)(2); and the tort exception, *id.* § 1605(a)(5). The question, then, is whether the Complaint includes allegations plausibly showing the presence of either exception to the Holy See's sovereign immunity. *See Rong v. Liaoning Province Gov't*, 452 F.3d 883, 888 (D.C. Cir. 2006) (recognizing that when a foreign-state defendant "challenges only the legal sufficiency of the plaintiff's jurisdictional allegations" the district court "should take the plaintiff's factual

---

[6]     The Supreme Court has not answered the question, but some Circuit Courts of Appeals say that if a plaintiff makes a satisfactory threshold showing of an FSIA exception's applicability, then a foreign-state defendant bears the ultimate burden of showing the exception's non-applicability. *See, e.g.*, *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013) ("[T]he FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies, and once shown, the sovereign bears the ultimate burden of persuasion to show the exception does not apply[.]" (citations omitted)); *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (stating that "the ultimate burden of persuasion" as to an FSIA exception's inapplicability "remains with the alleged foreign sovereign"); *Frank v. Commonwealth of Antigua & Barbuda*, 842 F.3d 362, 367 (5th Cir. 2016) ("Once the party seeking the exception has asserted at least some facts that would establish the exception, the party seeking immunity bears the ultimate burden of proving the nonapplicability of the exception raised by its opponent." (cleaned up)); *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) (The party claiming immunity under FSIA retains the burden of persuasion throughout [the] process."); *Peterson v. Rep. of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) ("If the plaintiff satisfies her burden of production, jurisdiction exists unless the defendant demonstrates by a preponderance of the evidence that the claimed [FSIA] exception does not apply."). I have found no Eighth Circuit case adopting this rule. Regardless, whether the Eighth Circuit has adopted (or would adopt) this rule is not relevant here. As I understand these out-of-Circuit cases, a foreign-sovereign-suing plaintiff bears at the very least a burden to allege facts plausibly showing that an FSIA exception applies. Here, the Holy See's Rule 12(b)(1) facial challenge concerns only whether Plaintiffs have satisfied this burden.

allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff").

2

Begin with the commercial-activity exception.  The FSIA provides an exception to sovereign immunity in any case

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  Under the FSIA, "commercial activity" is "a regular course of commercial conduct or a particular commercial transaction or act."  *Id.* § 1603(d).

As the Supreme Court has explained, determining whether the commercial-activity exception applies is a two-step process.  *First*, the FSIA's "based upon" element "requires a court to identify the particular conduct on which the plaintiff's action is based."  *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33 (2015) (cleaned up).  "[A]n action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit," *i.e.*, the "acts that actually injured" plaintiffs.  *Id.* at 34–35.  "[W]e zero[] in on the . . . acts that actually injured them."  *Id.* at 35; *see MMA Consultants 1, Inc. v. Republic of Peru*, 719 F. App'x 47, 52 (2d Cir. 2017), *cert. denied*, 139 S. Ct. 85 (2018) ("[W]e ask one simple question: what action of the foreign state actually injured the plaintiff?" (internal citation marks and quotation omitted)).  *Second*, we ask whether the injury-causing act or acts are "commercial activity"—that is, whether the act or acts are "'the type' of activity 'by which a private

15

party engages in' trade or commerce." *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019) (quoting *Rep. of Argentina v. Weltover*, 504 U.S. 607, 614 (1992)).  "When a foreign state acts 'not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of [the FSIA].'" *Cmty. Fin. Grp., Inc.*, 663 F.3d at 980 (quoting *Grossman*, 991 F.2d at 1382; *Weltover*, 504 U.S. at 614). "[T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives" but rather "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614 (citations and internal quotations omitted).  Because "Congress manifestly understood there to be a difference between a suit 'based upon' commercial activity and one 'based upon' acts performed 'in connection with' such activity[,]" there must be "something more than a mere connection with, or relation to, commercial activity." *Nelson*, 507 U.S. at 358.

Every court to have decided the question has determined that claims against the Holy See arising from clerical sexual abuse do not plausibly meet the FSIA's commercial-activity exception.  *O'Bryan*, 556 F.3d at 378–80 (determining that claims were not based upon commercial activity because "the gravam[e]n of plaintiffs' claims is the tortious conduct of priests which was allegedly facilitated by the tortious conduct of Holy See employees"); *Robles v. Holy See*, No. 20-CV-2106 (VEC), 2021 WL 5999337, at *3–4 (S.D.N.Y. Dec. 20, 2021) (holding that plaintiff's claims were not based upon commercial activity because the "essence" and "gravamen of Plaintiff's complaint is a personal injury

claim based on alleged sexual abuse[,]" and while the abusive priest's "employment . . . may have been commercial in some sense of the term, [his] alleged tortious behavior was not[]"); *Doe v. Holy See*, 434 F. Supp. 2d 925, 937–42 (D. Or. 2006), *aff'd in part, rev'd in part*, 557 F.3d 1066 (9th Cir. 2009) (holding that the commercial-activity exception did not apply because the complaint's essence concerned sexual abuse); *see O'Bryan v. Holy See*, 471 F. Supp. 2d 784, 788 (W.D. Ky. 2007) (same), *aff'd*, 556 F.3d 361; *but see Doe v. Holy See*, 557 F.3d 1066, 1089–97 (Berzon, J., dissenting in part).

A common thread running through these cases is the conclusion that sexual-abuse claims are not based upon commercial activity because the claims "sound in tort."  In the *Doe* district court decision—evidently the first court to address this question—the court recognized that "with purpose and motive deleted from the evaluation, the alleged activities of the Holy See might be characterized as commercial."  434 F. Supp. 2d at 941.  The district court nonetheless determined that the commercial-activity exception did not apply because the "true essence" of Doe's complaint was not commercial.  *Id.* at 942.  The court explained:

> Here, plaintiff's complaint does not allege property damage, breach of contract for goods or services, product liability, copyright infringement, an indebtedness yet unpaid on a loan or other transaction, or any other theory whose true essence is commercial.  Instead, at the heart of plaintiff's complaint is the injury inflicted by a sexually abusive priest at plaintiff's church, a claim clearly sounding in tort.

*Id.*  Subsequent decisions repeat this conclusion.  In *O'Bryan*, the Sixth Circuit followed *Doe*, explaining that it would not apply the commercial-activity exception because "the gravam[e]n of plaintiffs' claims is the tortious conduct of priests which was allegedly

facilitated by the tortious conduct of Holy See employees."  556 F.3d at 380; *see O'Bryan*,

471 F. Supp. 2d at 788 (holding that the sex-abuse claims "sound[ed] in tort" and therefore

were not "commercial in nature" (quotation omitted)).   And in *Robles*, the district court

explained that, though the employment of an abusive priest "may have been commercial

in some sense of the term," the tortious abusive behavior was not.   2021 WL 5999337,

at *3.   The court continued:

> To the extent that other plaintiffs have attempted to rely on the
> Commercial Activity Exception as a basis for jurisdiction over
> the Holy See for clergy sexual abuse claims, courts have
> consistently held that such claims are tortious in nature and
> therefore do not fall within the Commercial Activity
> Exception.

*Id.* (citing *O'Bryan*, 556 F.3d at 380; *Doe*, 434 F. Supp. 2d at 942; and *O'Bryan*, 471 F.

Supp. 2d at 788).   These cases hold, in other words, that a sex-abuse claim is inherently

tortious—not commercial—and for this reason cannot trigger the FSIA's commercial-

activity exception to sovereign immunity.   *See also Shamoun v. Republic of Iraq*, 441 F.

Supp. 3d 976, 998 (S.D. Cal. 2020) (finding that commercial-activity exception did not

apply to sexual assault claims brought by employee against foreign sovereigns because the

plaintiff's claims were based upon tort allegations, not commercial activities).

     This holding seems debatable.   As described above, the Supreme Court has

instructed that, after identifying the particular conduct that is the gravamen of the suit, the

commercial-activity question turns on whether the injury-causing act or acts are

"commercial activity"—that is, whether the act or acts  are "'the type' of activity 'by which

a private party engages in' trade or commerce."  *Jam*, 139 S. Ct. at 772 (quoting *Weltover*,

504 U.S. at 614).  Asking whether the injury-causing acts are commercial activity in that sense seems different from asking merely whether the plaintiff's claim "sounds in tort." After all, tort claims routinely arise out of commercial activities.  Consider the package-delivery driver who runs over a pedestrian.  What about the trip-and-fall in a retail store? Or the motor-vehicle accident resulting from a defectively manufactured tire?  Consistent with the idea that a tort claim may arise out of commercial activities, courts have held that discrimination and sexual-harassment claims may trigger the FSIA's commercial-activity exception.  *See, e.g.*, *Shih v. Taipei Econ. and Cultural Representative Off.*, 693 F. Supp. 2d 805, 811 (N.D. Ill. 2010) (holding that former employees' ADEA claims triggered commercial-activity exception because "[m]aking decisions about what tasks employees perform, how much they are paid, or how they are treated in the workplace . . . are decisions that parties in the private sector make every day"); *Zveiter v. Brazilian Nat'l Superintendency of Merchant Marine*, 833 F. Supp. 1089, 1093 (S.D.N.Y. 1993) (holding that former employee's sexual-harassment claim triggered the commercial-activity exception because "in employing a secretary, the foreign sovereign enters the marketplace and acts just as a private party would in engaging in this 'commercial activity'") (Sotomayor, J.), *supplemented by* 841 F. Supp. 111 (S.D.N.Y. 1993).

As I understand the Supreme Court cases, the question to answer on this case's facts is not merely whether Plaintiffs' claims "sound in tort," but whether the sexual abuse Wehmeyer and Adamson perpetrated against Plaintiffs—*i.e.*, the acts that actually injured Plaintiffs—are activities by which a private party engages in trade or commerce, *see Jam*,

139 S. Ct. at 772, or whether there is "something more than a mere connection" between the abuse and identified commercial activity, *Nelson*, 507 U.S. at 358.

With the question so framed, Plaintiffs do not allege facts plausibly showing that the sexual abuse perpetrated against them is based upon a commercial activity in the relevant sense. Plaintiffs allege that the Holy See engages in many commercial activities. These include, for example, employing priests and others, Compl. ¶¶ 12–13, 17–18; soliciting and collecting member contributions, *id.* ¶¶ 18, 23–24, 26–28; recruiting and soliciting members, *id.* ¶ 19; reporting financial information, *id.* ¶ 32; organizing and operating educational organizations, *id.* ¶ 33, and earning revenue through those organizations, *id.* ¶ 44; organizing and operating "new divisions of its business and private enterprise (called a "Diocese" or "Archdiocese") around the world[,]" *id.* ¶ 34; acquiring, managing, and disposing of real property, *id.* ¶ 41; and performing religious services, *id.* ¶ 146. Plaintiffs neither allege nor argue that the abuse itself was a commercial activity. The Complaint, however, draws no connection between any of the assertedly commercial activities it identifies and Wehmeyer and Adamson's abuse of Plaintiffs. Wehmeyer abused the Hoffmans during camping trips. *See id.* ¶¶ 174, 176–77. The Complaint gives no other context to the circumstances of the Hoffman's abuse. *See id.* ¶¶ 178–80. Nor does the Complaint give context to Adamson's abuse of Keenan. *See id.* ¶¶ 239, 252. The absence of any alleged connection between the identified commercial activities and Plaintiffs' abuse distinguishes this case from cases like *Shih* and *Zveiter*, where the alleged discrimination and harassment occurred in and was intertwined with the workplace and the defendant sovereigns' commercial activities.

20

Considered against the Complaint's allegations and controlling Supreme Court precedents, the arguments Plaintiffs advance for applying the commercial-activity exception are not persuasive. (1) Relying on the dissenting opinion in the Ninth Circuit's *Doe* decision, Plaintiffs contend that their case is based at least in part on employment relationships between the Holy See, on the one hand, and Wehmeyer and Adamson, on the other, and that these employment relationships constituted commercial activity. *See* Compl. ¶ 18; ECF No. 75 at 55; *see also Doe*, 557 F.3d at 1089–97 (Berzon, J., dissenting in part). In her dissent, Judge Berzon reasoned that the *Doe* plaintiff's negligent supervision, retention, and failure-to-warn claims should have survived under the commercial-activity exception because the employment relationship between the abusive priest and the Holy See was a commercial activity, and its existence was "a necessary element" of the negligent supervision and retention claims and led to a duty to warn. *Doe*, 557 F.3d at 1093–94. This reasoning, however, embraces the "one-element" approach later rejected in *OBB*, 577 U.S. at 34–35. (2) For similar reasons, Plaintiffs' reliance on *BP Chems. Ltd. v. Jiangsu Sopo Corp*., 285 F.3d 677, 682 (8th Cir. 2002), for the proposition that "only one claim or element of a claim need concern commercial activity in the United States to erode . . . presumptive immunity[,]" is unavailing. Not only did that decision precede *OBB*, but the complaint in that case alleged very different facts involving trade-secret misappropriation. *Id.* at 682. (3) Plaintiffs argue that their Complaint is distinguishable from previous cases brought against the Holy See because it asserts additional, inherently commercial causes of action, including for breach of contract, breach of implied covenant of good faith and fair dealing, violations of the Minnesota Uniform

Deceptive Trade Practice Act, and violations of the Minnesota False Statements in Advertising Act. ECF No. 75 at 58, 63. This is not entirely accurate. In *Doe*, the plaintiff asserted similar causes of action for fraud and conspiracy to commit fraud. *See* 434 F. Supp. 2d at 940. The *O'Bryan* plaintiffs asserted breach-of-fiduciary-duty, deceit, and misrepresentation claims. 556 F.3d at 369–70. And in *Robles*, the plaintiff alleged, among other claims, that an implied contract was formed when he was placed in the church's care. 2021 WL 5999337, at *3. Regardless, if the causes of action that Plaintiffs highlight might generally be described as possessing a "more commercial" character than the claims brought in the earlier cases, the law is clear that the underlying allegations' essence—not their nomenclature—is dispositive. *See id.* at *3–4. To say that a case is "based upon" commercial activity because certain causes of action have been asserted would conflict with the Supreme Court's admonition that the proper inquiry is not "an exhaustive claim-by-claim, element-by-element analysis." *See OBB*, 577 U.S. at 34. (4) Plaintiffs argue that the commercial-activity exception applies because their Complaint contains substantially more factual allegations of the Holy See's performance of commercial activity than the complaint in *Doe*. ECF No. 75 at 62. Even if true, as explained earlier, the Complaint's many detailed commercial-activity allegations are not this case's essence. This case's essence is child sex abuse.

The bottom line is this: The gravamen of Plaintiffs' claims is sex abuse, but Plaintiffs do not argue that the sex abuse alone was a commercial activity, and they allege no plausible connection between that abuse and any of the Holy See's assertedly

commercial activities.  The FSIA's commercial-activity exception to sovereign immunity does not apply.

3

a

Under the FSIA's tort exception (as relevant here), a foreign sovereign is not immune from federal jurisdiction in any case "in which money damages are sought against" the sovereign "for personal injury . . . [i] occurring in the United States and [ii] caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state [iii] while acting within the scope of his office or employment[.]"  28 U.S.C. § 1605(a)(5).  (There are exceptions to the tort exception—one for claims based on a sovereign's performance of discretionary functions and the other for, as relevant here, claims arising out of misrepresentation, 28 U.S.C. § 1605(a)(5)(A), (B)—but these exceptions to the exception will be addressed later.)

b

There is one Article III jurisdictional problem, and this seems like the best time to address it in view of how the problem was raised.  The Holy See teed up the issue by arguing that—as a matter of statutory interpretation—§ 1605(a)(5)'s reference to "money damages" forecloses Plaintiffs' claims for injunctive relief in Counts 9 through 11 and Plaintiffs' claim under the Minnesota Uniform Deceptive Trade Practices Act, which permits only injunctive remedies, *see Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.* 603 N.W.2d 336, 339 (Minn. Ct. App. 1999).  ECF No. 69 at 52.  To support this contention, the Holy See cites authority addressing identical language in the Federal Tort

Claims Act ("FTCA") immunity waiver, 28 U.S.C. § 1346(b)(1), on which the FSIA's immunity waiver in § 1605(a)(5) is modeled.  The FTCA's immunity waiver has been construed to permit only damages claims, not claims for injunctive relief, *see, e.g.*, *E. Ritter & Co. v. Dep't of Army, Corps of Eng'rs*, 874 F.2d 1236, 1244 (8th Cir. 1989).  The Holy See argues that § 1605(a)(5) deserves the same interpretation.

Plaintiffs disagree.  *See* ECF No. 75 at 93–94.  To support their position that injunctive relief is available under § 1605(a)(5), Plaintiffs point to a different FSIA provision, 28 U.S.C. § 1606.  It says that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances" as to any claim for which it is not entitled to immunity.  *Id.*  In Plaintiffs' view, § 1605(a)(5) must be interpreted in light of § 1606.  Since injunctive relief is sometimes available in personal-injury claims—that is, "under like circumstances"—Plaintiffs say it would be a mistake to read § 1605(a)(5)'s "money damages" clause as ruling out injunctive relief.  Plaintiffs also cite a case, *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012), but the case is not helpful because there, the sovereign waived immunity, *id*. at 263, making it unnecessary for the court to address the tort exception.

Though the statutory interpretation question the parties brief is unsettled, Article III answers the same question in the Holy See's favor.[7]  "Federal jurisdiction is limited by Article III, § 2, of the U.S. Constitution to actual cases and controversies."  *Steger v.*

---

[7]   It doesn't matter that the parties did not address this question from the constitutional perspective.  Article III standing "is a jurisdictional prerequisite and thus a threshold issue that [a court is] obligated to scrutinize, sua sponte if need be."  *Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016) (internal quotation marks and citation omitted).

*Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000).  "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "In the case of complaints for injunctive relief, the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000).  This threat must be "real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–04, 107 n.8 (1983).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Park*, 205 F.3d at 1037 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

Here, Plaintiffs do not allege facts plausibly showing a real and immediate threat of future injury to themselves from the Holy See.  They allege no facts suggesting, for example, that any of them faces any threat of further abuse or some other type of harm owing to the Holy See's conduct.  For this reason, there is not subject-matter jurisdiction to consider granting Plaintiffs the injunctive relief they seek, and Counts 5, 9, 10, and 11 must be dismissed on this basis.

c

i

Now turn to the tort exception's three elements.  The Holy See argues that the tort exception does not apply because Plaintiffs' claims depend on facts that occurred outside

the United States.  ECF No. 69 at 36–37; ECF No. 81 at 19–20.  Plaintiffs acknowledge that the Complaint includes allegations regarding the Holy See's conduct outside the United States, and it seems clear that Plaintiffs included these allegations to substantiate their claims to some extent (and not as mere background material).  So framed, the parties' arguments raise a legal question regarding the extent to which the FSIA's tort exception requires a claim to depend on allegations showing that the tort occurred in the United States.

The tort exception "covers only torts occurring within the territorial jurisdiction of the United States."  *Amerada Hess Shipping Corp.*, 488 U.S. at 439–41.  "[I]n contrast to the commercial activity exception, a tortious act having 'direct effects' in the United States will not satisfy the requirements" of the noncommercial tort exception.  *O'Bryan*, 556 F.3d at 381–82 (citing *Amerada Hess Shipping Corp.*, 488 U.S. at 441); *see also Doe v. Fed. Democratic Republic of Ethiopia*, 851 F.3d 7, 12 (D.C. Cir. 2017) ("[T]he noncommercial-tort exception does not ask where the 'gravamen' occurred; instead, it asks where the '*entire* tort' occurred." (citations omitted)).

Some circuit courts of appeals and district courts have interpreted § 1605(a)(5) to require that the "entire tort"—that is, the injury *and* the tortious acts—occur in the United States.  *See, e.g.*, *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014) ("[N]ot only the injury but also the act precipitating that injury [] must occur in the United States."); *O'Bryan*, 556 F.3d at 382 (reasoning that this interpretation was "most in keeping with both Supreme Court precedent" and the "primary purpose in enacting § 1605(a)(5) [] to eliminate a foreign state's immunity for traffic accidents and other torts committed in the

United States, for which liability is imposed under domestic tort law" (citations omitted)); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1524–25 (D.C. Cir. 1984) (same) (Scalia, J.); *Robles*, 2021 WL 5999337, at *11; *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 427–28 (S.D.N.Y. 2019); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 108 (D.D.C. 2005).

The Eighth Circuit has not decided this issue, and its lone decision considering the tort exception does not signal how it might answer the question.  In *Community Fin. Grp. v. Republic of Kenya*, the plaintiffs wired funds from the United States to the defendant to purchase gold, but the defendant retained both the gold and the plaintiffs' money.  663 F.3d 977, 979–80 (8th Cir. 2011).  The plaintiffs filed suit, alleging claims "for breach of duty, improper taking in violation of international law, conversion, conspiracy to commit a tort, aiding and abetting an improper taking and fraudulent scheme, and unjust enrichment." *Id.* at 980.  The district court dismissed the action for lack of subject-matter jurisdiction under the FSIA.  *Id.*  On appeal, the Eighth Circuit held that the tort exception did not apply because "all of the alleged torts would have occurred in Kenya rather than the United States." *Id.* at 982 (rejecting the plaintiffs' argument that their wire transfer to the defendant constituted a tortious act in the United States because the act was performed by plaintiffs themselves).  Although the court's reasoning in *Comm. Fin. Grp.* is consistent with the "entire tort" rule, the court was not faced with interpreting § 1605(a)(5)'s precise scope because the case's factual allegations involve no tortious conduct in the United States.  *Id.* (rejecting the plaintiffs' argument that the conspiracy originated in the United

States based on discussions they had with a United States citizen because the amended complaint did not allege that the person was an agent of the defendant).

Plaintiffs rely on the Ninth Circuit's opinion in *Olsen by Sheldon v. Government of Mexico*, 729 F.2d 641 (9th Cir. 1984), to support their position that not all of the alleged tortious conduct must occur within the United States.  ECF No. 75 at 27 n.5.  In *Olsen*, the plaintiffs asserted wrongful-death claims following the crash of an airplane owned by the Mexican government in California on which their parents were passengers.  729 F.2d at 643–44.  The Ninth Circuit rejected the Mexican government's argument that § 1605(a)(5) "requires all the acts or omissions constituting the tort to occur within the United States," holding that allegations showing the occurrence of "at least one entire tort" in the United States could bring the case within the noncommercial tort exception.  *Id.* at 645–46 ("many potentially tortious acts and omissions occurring both in Mexico and the United States caused the crash").  The court reasoned that "requiring every aspect of the tortious conduct to occur in the United States . . . would encourage foreign states to allege that some tortious conduct occurred outside the United States" in order to retain immunity, "diminish[ing] the rights of injured persons seeking recovery."  *Id.* at 646.  In *Doe*, the district court applied *Olsen*, reasoning that "[n]owhere in *Amerada Hess* is the exception made inapplicable by plaintiff's allegations of conduct or injury occurring outside of the United States but going to the same tort."  434 F. Supp. 2d at 952–53 (noting that it might be "difficult to pinpoint the site" of a tortious act or omission, such as a failure to warn).  There is reason to question whether the Ninth Circuit would reach the same conclusion today.  On appeal of *Doe*, the Ninth Circuit did not decide the issue, concluding instead that the plaintiff's claims were

barred under the discretionary function exception.  557 F.3d at 1085; *see also Broidy Cap.*

*Mgmt., LLC, v. State of Qatar*, 982 F.3d 582, 590 (9th Cir. 2020).  But the Ninth Circuit

stated that it otherwise might have had "occasion to consider whether the *entire* tort must

occur in the United States, as the Sixth and D.C. Circuits have held." *Doe*, 557 F.3d at

1085 n.11.

Faced with the weight of authority favoring the "entire tort" rule, no contrary

binding precedent, and the Ninth Circuit's evident recognition that its contrary rule might

warrant reconsideration, the better answer is to apply the "entire tort" rule here.[8]

The "entire tort" rule's consequences for this case may be described only in broad

terms.  The tort exception does not apply to Plaintiffs' claims that depend (even as to one

element) on alleged facts occurring outside the United States, including the Holy See's

conduct abroad.  *See O'Bryan*, 556 F.3d at 385–86 (explaining direct claims against the

Holy See based on its own negligent supervision or promulgation of policies would not fall

within the noncommercial tort exception because those acts presumably occurred abroad).

In other words, if the Complaint identifies *only* facts occurring abroad to support a claim

or even one element of a claim, the tort exception would not apply to that claim.  As will

be explained, the "entire tort" rule is not, however, "wholly dispositive" of claims premised

on a theory of vicarious liability for the conduct of Roman Catholic clergy in the United

States.  *See O'Bryan*, 556 F.3d at 386; *see also* ECF No. 81 at 19 (recognizing that under

---

[8]     For a helpful explanation and critique of the "entire tort" rule, *see* Note, *Foreign
Relations Law – Sovereign Immunity – D.C. Circuit Finds Ethiopia Immune in Hacking
Suit. – Doe v. Fed. Dem. Rep. of Ethiopia, 851, F.3d 7 (D.C. Cir. 2017), reh'g denied, 2017
U.S. App. LEXIS 10084 (D.C. Cir. Jun 6, 2017)*, 113 Harv. L. Rev. 1179 (2018).

Plaintiffs' argument, "only vicarious liability could survive under the tort exception").  In other words, the "entire tort" rule would not preclude subject-matter jurisdiction over those claims arising exclusively from the conduct of clergy whose torts are alleged to have occurred in the United States.  The failure to identify precisely which of Plaintiffs' claims fall in which of these categories is deliberate.  The Complaint is not specific, and the parties' submissions did not address this question with particularity.

ii

The next question is whether Plaintiffs allege facts plausibly showing that their harm was "caused by the tortious act or omission of" the Holy See "or of any official or employee of" the Holy See.  28 U.S.C. § 1605(a)(5).  Plaintiffs seek to attribute liability to the Holy See based on the actions of (A) American archdioceses, dioceses, and churches; (B) American-based clergy; and (C) other unidentified "agents."  Deciding whether the actions of these organizations, individuals, or others may be attributed to the Holy See requires applying unique legal rules to each category.

(A) Whether Roman Catholic organizations in the United States may trigger the Holy See's amenability to suit in a federal district court depends on whether the Complaint alleges facts plausibly overcoming the presumption of "separate juridical [status]" established in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*").[9]  *Bancec* describes rules for determining whether a foreign

---

[9]     The Holy See has submitted certified public records showing that each of the at-issue entities has been incorporated in its respective state.  ECF Nos. 71-1, 71-2, and 71-3.  Plaintiffs do not allege explicitly that these entities are not separately incorporated.  To repeat, these records appropriately may be considered in adjudicating the Holy See's facial

state's instrumentality may be held liable for the actions of the foreign state—the reverse of the issue here.  The Eighth Circuit has not confronted this issue, but the Fifth, Ninth, and D.C. Circuit Courts of Appeals have extended *Bancec*'s principles to resolve "the question whether the actions of a corporation may render a foreign sovereign amenable to suit" under the FSIA.  *See Doe*, 557 F.3d at 1078–80 ("*Bancec* provides a workable standard for deciding" whether "a particular individual or corporation is an agent of a foreign state"); *Transamerica Leasing v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533–36 (5th Cir. 1992).  There is no reason to suspect that the Eighth Circuit might not follow this same course.  Therefore, *Bancec* will be applied here.

Under *Bancec*, the presumption of separate juridical status may be overcome (1) when "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," or (2) when recognizing the separate status of an instrumentality "would work fraud or injustice."  462 U.S. at 629; *see Transamerica Leasing*, 200 F.3d at 848 ("*Bancec* recognized these as exceptions to the rule that a foreign sovereign is not liable for the acts of an instrumentality of the state, [but] they serve also as exceptions to the rule that a foreign sovereign is not amenable to suit based on the acts of such an instrumentality.").  In applying the *Bancec* standard, courts apply several factors, as appropriate, including "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials

---

challenge to subject-matter jurisdiction.  *Noble Sys. Corp.*, 543 F.3d at 982; *see also Degnan v. Sebelius*, 959 F. Supp. 2d 1190, 1193 (D. Minn. 2013).

manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations."[10] *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018).

In *Doe*, the Ninth Circuit, applying *Bancec*, concluded that the plaintiff had not alleged sufficient facts to overcome the presumption:

> Doe's complaint does not allege day-to-day, routine involvement of the Holy See in the affairs of the Archdiocese, the Order, and the Bishop.  Instead, it alleges that the Holy See "creates, divides[,] and re-aligns dioceses, archdioceses and ecclesiastical provinces" and "gives final approval to the creation, division or suppression of provinces of religious orders."  Doe also alleges that the Holy See "promulgates and enforces the laws and regulations regarding the education, training[,] and standards of conduct and discipline for its members and those who serve in the governmental, administrative, judicial, educational[,] and pastoral workings of the Catholic [C]hurch world-wide."  These factual allegations—that the Holy See participated in creating the corporations and continues to promulgate laws and regulations that apply to them—are . . . insufficient to overcome the presumption of separate juridical status.

557 F.3d at 1079–80.  The Ninth Circuit reasoned that it could not infer the type of day-to-day control required merely from the plaintiff's use of the term "agent" in the complaint.

---

[10]     Congress enacted a slightly modified version of these factors to address whether a foreign sovereign's property is immune from attachment and execution.  *See* 28 U.S.C. § 1610(g) (abrogating *Bancec* "with respect to the liability of agencies and instrumentalities of a foreign state where a § 1605A judgment holder seeks to satisfy a judgment held against the foreign state," *Rubin*, 138 S. Ct. at 823).  Regardless, the *Bancec* factors remain applicable to assessing the relationship between a foreign state and its instrumentalities as it pertains to the foreign state's jurisdictional immunity from suit under § 1605(a).

*Id.* at 1080.  The Ninth Circuit also rejected the district court's conclusion that jurisdiction was proper under the second, "fraud or injustice" prong of the *Bancec* standard, because the plaintiff "ha[d] not alleged that the Holy See ha[d] inappropriately used the separate status of the corporations to its own benefit . . . or that the Holy See created the corporations for the purpose of evading liability for its own wrongs."  *Id.*; *see also Blecher v. Holy See*, 631 F. Supp. 3d 163, 169–70 (S.D.N.Y. 2022) (finding that neither conclusory allegations of Holy See's control over American bishops and dioceses nor common law agency principles were enough to overcome *Bancec* presumption); *Robles*, 2021 WL 5999337, at *4–6 (finding that Holy See's control over isolated aspects of domestic corporations' operations insufficient to satisfy "extensive control" of the "domestic corporation as a whole").

Plaintiffs allege facts directed at overcoming the *Bancec* presumption.[11]  Plaintiffs allege that the Holy See "is a unique entity, with an organizational structure and chain of command that mandates that [it] and its head of state, the Supreme Pontiff, have a significantly high level of involvement in the routine and day-to-day activities of its agents and instrumentalities."  Compl. ¶ 20; *see id.* ¶ 15 (alleging that the Holy See has "unqualified power over the Catholic Church, including each and every individual and

---

[11]  Several of the Complaint's allegations are conclusory or plead legal conclusions.  *See, e.g.*, Compl. ¶ 151 ("To the extent that some of the entities underneath [the] Holy See's absolute control are separate corporations, [the] Holy See maintains complete control over these separate corporations."); *id.* ¶ 152 ("Any corporations, including but not limited to any Archdiocese or Diocese in Minnesota which was or is incorporated, were and are an alter ego of [the] Holy See.").  Again, these and similar allegations are not entitled to a presumption of truth and have not been considered.  *See Iqbal*, 556 U.S. at 681.

section of the church"); ¶ 37 (alleging that the Holy See "controls [local business units']

day-to-business and provides for no discretion on numerous issues" including the

"handling of child sex abuse by clergy").   Plaintiffs aver that the Holy See is "solely

responsible" for creating, modifying, and eliminating dioceses, Compl. ¶¶ 34; that it

appoints and assigns bishops, archbishops, cardinals, and superiors of religious orders to

lead its entities, and is "directly and solely responsible for removing [them] from service,"

*id.* ¶¶ 39, 40, 52; and that it "directs and requires each of [its] entities to strictly follow all

of its policies and procedures," including those concerning the handling of sexual abuse

allegations, *id.* ¶¶ 151–52.  Plaintiffs allege that the fundraising mission of each diocese is

"under the oversight and control" of the Holy See, *id.* ¶¶ 23–24; that funds raised by the

dioceses are sent to the Holy See, *id.* ¶ 27–28; that each diocese pays an annual monetary

assessment to the Holy See, *id.* ¶ 31; and that the Holy See "has control over and

involvement with property owned by all Catholic entities in Minnesota" and its

"permission is required for the alienation [] of much of [that] property," *see id.* ¶ 36.

Plaintiffs allege that the Holy See "oversees and controls the admissions requirements and

curricula" of seminaries in the United States, *id.* ¶ 33, and requires bishops to file reports

regarding their clergy "on a regular basis," *id.* ¶¶ 40, 49.  Plaintiffs allege that "agents in

charge of [the Holy See's] operation in a particular geographical location" are required to

travel to Rome to report on their operations and submit written reports once every five

years. *Id.* ¶¶ 32, 151.  Plaintiffs allege that the Holy See "determined long ago that it would

require some of the entities under its control to incorporate in order to reduce [its] exposure

to claims by people that it harmed, in order to keep the public from discovering [its]

involvement in the systematic cover-up and concealment of child sex abuse by its agents, and in order to defraud those people that its agents harmed, including those that its agents sexually abused as children." *Id.* ¶ 153.

These allegations do not plausibly get past *Bancec*'s presumption. The Complaint's allegations are self-defeating on this question in the sense that they show that the Holy See is involved with the at-issue entities at a higher level and with less regularity than routine, day-to-day control. As Plaintiffs themselves allege, for example, bishops and other appointed religious leaders are responsible for leading dioceses and archdioceses, and those leaders report to the Holy See intermittently—"at least once every five years." *Id.* ¶ 32. That once-every-five-years reporting frequency does not plausibly show day-to-day control. It implies something different. According to Plaintiffs, the Holy See does not claim entitlement to all revenue received by archdiocese, dioceses, and churches; rather, these organizations send a portion of their revenue to the Holy See as a "tax for certain activities." *Id.* ¶ 30–31. We don't ordinarily think of a sovereign's exercise of taxation authority as demonstrating day-to-day control of those subject to a tax. Many of Plaintiffs' allegations show that the Holy See retains ultimate churchwide authority. *See, e.g.*, *id.* ¶¶ 35–37. But alleging that the Holy See (or any other organization) retains or reserves authority regarding an issue does not plausibly show that the Holy See exercises day-to-day control with regard to that issue. The establishment of churchwide doctrine and veto power do not show day-to-day control. Plaintiffs' allegations regarding bishops' "problem clergy" reporting obligations show that bishops—not the Holy See—exercise day-to-day supervision and control over clergy. *Id.* ¶ 40.

Plaintiffs argue that their allegations overcome the *Bancec* presumption, but Plaintiffs' arguments are not persuasive. Plaintiffs argue that their case is distinguishable from *Doe, Blecher*, and *Robles* because "they allege extensive facts concerning the agency relationship and with much more detail than in [those cases]." ECF No. 75 at 39–40; *see* ECF No. 76  Exs. 2, 3, 4. Plaintiffs are correct that the allegations in those cases were not as extensive, but the allegations here are not substantively different. Moreover, though "the degree to which government officials manage the entity or otherwise have a hand in its daily affairs" is only one consideration in applying the *Bancec* standard, the Ninth Circuit in *Doe* reasonably emphasized this factor when evaluating the plausibility of the plaintiff's allegations about the extent of the Holy See's control over its domestic entities. There is no reason to reach a different conclusion here. Plaintiffs also argue that they have pleaded "exhaustive facts" to support an inference that the Holy See "used the separate status to its benefit and created the entities to evade liability" such that upholding the presumption "would permit a fraud and be unjust." ECF No. 75 at 40. But the Complaint's sole allegation on this point, Compl. ¶ 153, is conclusory. Accordingly, Plaintiffs may not establish subject-matter jurisdiction here by attributing the conduct of the archdioceses and churches involved in this case to the Holy See.

(B) Whether Roman Catholic clergy in the United States may trigger the Holy See's amenability to suit in a federal district court depends on whether the Complaint alleges facts plausibly showing that the clergy who are alleged to have "caused" Plaintiffs' damages are "official[s] or employee[s] of" the Holy See. 28 U.S.C. § 1605(a)(5). The FSIA prescribes no substantive rules for assessing liability; accordingly, "[w]here state law

provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." *Bancec*, 462 U.S. at 622 n.11; *see* 28 U.S.C. § 1606 ("As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances[.]").  Authorities make clear, and Plaintiffs and the Holy See agree, that Minnesota law applies to determine whether clergy in the United States are Holy See employees.  *See Doe*, 557 F.3d at 1081–83; *Robles*, 2021 WL 5999337, at \*6; ECF No. 69 at 51–63; ECF No. 75 at 35–63.

Minnesota law imposes respondeat superior/vicarious liability on an employer "for the torts of an employee committed within the course and scope of employment." *Fahrendorff ex rel. Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999); *see also Snilsberg v. Lake Washington Club*, 614 N.W.2d 738, 745 (Minn. Ct. App. 2000).  Under Minnesota law, courts look to five factors to determine whether a person is an employee:

> (1) The right to control the means and manner of performance;
> (2) the mode of payment;
> (3) the furnishing of material or tools;
> (4) the control of the premises where the work is done; and
> (5) the right of the employer to discharge.

*Jenson v. Dep't of Econ. Sec.*, 617 N.W.2d 627, 630 (Minn. Ct. App. 2000) (quoting *Speaks, Inc. v. Jensen*, 243 N.W.2d 142, 144 (Minn. 1976)).  The right of the alleged employer to control the means and manner of performance is "the most important factor." *Id.*

Plaintiffs allege facts plausibly showing that the clergy alleged to have committed tortious conduct within the United States were employees of the Holy See at the time of the conduct. Plaintiffs allege broadly that the priests who committed the abuse, as well as other relevant clergy members in the Archdiocese, were employees under the control of the Holy See. *See* Compl. ¶¶ 12–18, 146–47, 158, 215, 235. Plaintiffs go further. They allege facts going to each of the relevant factors, including the right to control the means and manner of performance. Plaintiffs allege that the Holy See "oversees and controls the admissions requirements and curricula" of seminaries, *id.* ¶¶ 33, 40; "controls the standards, morals, and obligations" of clergy, *id.* ¶¶ 37–38, 45, and that all clergy "vow to show respect and obedience to [the Holy See]," and to their bishop or other religious superiors, *id.* ¶¶ 39, 47–48, 148; writes and promulgates rules and regulations "used as the employee manual for clergy," *id.* ¶¶ 45, 50, 55–56; "appoints, assigns and re-assigns bishops [and] superiors of religious orders" and has "the final and sole power to remove individual clergy," *id.* ¶¶ 39, 40, 46, 51–52, 146, 154–55; "is responsible for the work and discipline" of clergy, *id.* ¶¶ 40, 46, 49, 146; controls where clergy live and prohibits them from engaging in certain conduct, *id.* ¶ 38; controls clergy's clothing, routine, practices, and teachings, *id.* ¶ 146; supplies clergy with "materials for their fundraising and solicitation of property, *id.* ¶ 146; and provides "financial support throughout the full length" of a clergy member's life unless the Holy See approves the termination of such pension, *id.* ¶¶ 47, 146.[12]

---

[12]   In its principal memorandum, the Holy See argues that "Plaintiffs' reliance on interpretations of religious doctrine, religious beliefs, and canon law to demonstrate

(C) Plaintiffs allege throughout their Complaint that the Holy See acts in various ways through unnamed "agents." *See, e.g.*, Compl. ¶¶ 17, 29, 37, 45, 61, 81, 146, 317, 338. In its opening brief, the Holy See argued that "[§] 1605(a)(5) does not extend jurisdiction to tortious acts or omissions by mere 'agents,'" characterizing the statute's lack of explicit reference to agents as reflecting "a legislative determination that courts must respect." ECF No. 69 at 34. Plaintiffs did not respond to this argument. I conclude, therefore, that Plaintiffs have waived their right to oppose this issue. *See United States v. Thirty-Two Thousand Eight Hundred Twenty Dollars and Fifty-Six Cents ($32,820.56) in United States Currency*, 838 F.3d 930, 937–38 (8th Cir. 2016). In this case, claims based on the actions of unnamed "agents" are not sufficient to trigger the tort exception.[13]

'agency'" is barred by the Establishment Clause and Free Exercise Clause of the First Amendment. ECF No. 69 at 63–64. Plaintiffs acknowledge that the relationship between the Holy See and its entities and clergy is "unlike any other," ECF No. 75 at 40, but do not otherwise address this question. It is true that the Holy See exercises church-wide control "through its spiritual authority and canon law." Jacob W. Neu, *"Workers of God": The Holy See's Liability for Clerical Sexual Abuse*, 63 Vanderbilt L. Rev. 1507, 1523 (2019). Neutral principles were applied to answer whether the *Bancec* presumption applies here and the employment question.

[13]    Plaintiffs allege facts plausibly showing causation. In Minnesota, causation in the context of general tort liability is established through the "substantial factor test." *George v. Est. of Baker*, 724 N.W.2d 1, 10 (Minn. 2006); *see Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 372 (Minn. 2008). An act is "a direct, or proximate, cause of harm if the act was a substantial factor in the harm's occurrence." *George*, 724 N.W.2d at 10 (citations omitted). "[T]he existence of proximate cause is usually a question of fact for the jury," but "when reasonable minds could reach only one conclusion, it is a question of law." *Lietz v. N. States Power Co.*, 718 N.W.2d 865, 872 (Minn. 2006) (quotation omitted). Throughout their Complaint, Plaintiffs allege particular facts regarding Wehmeyer and Adamson's abuse and church officials' actions relating to Wehmeyer and Adamson. *See, e.g.*, Compl. ¶¶ 61, 79, 101, 104, 207–14, 227–34, 246–54, 255–64. These allegations plausibly meet Minnesota's causation standards. The Holy See does not appear to dispute this conclusion. It seems to challenge causation only with respect to its direct actions,

iii

Plaintiffs argue that Minnesota law governs whether the employees' tortious conduct occurred within the scope of their employment, ECF No. 75 at 27–31, and the Holy See does not dispute this, *see* ECF No. 69 at 30, 34–35; ECF No. 81.  The standard for determining whether an employee's conduct occurred within the scope of employment depends on whether the conduct was intentional or negligent.  "[A]n employer is liable for an employee's intentional misconduct if '(1) the source of the [tort] is related to the duties of the employee, and (2) the [tort] occurs within work-related limits of time and place.'" *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 583 (Minn. 2008) (quoting *Fahrendorff*, 597 N.W.2d at 910).  "The critical inquiry to determine if the source of the harm is related to the duties of the employee is whether the employee's acts were foreseeable." *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34, 47 (Minn. Ct. App. 2009); *see also Hartford Fire Ins. Co. v. Clark*, 727 F. Supp. 2d 765, 770 (D. Minn. 2010) ("The Court cannot overstate the importance of the foreseeability requirement under Minnesota law.").  An employer need not actually foresee the misconduct so long as it is "not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Hagen v. Burmeister & Assocs., Inc.*, 633 N.W.2d 497, 505 (Minn. 2001) (quoting *Fahrendorff*, 597 N.W.2d at 912).  "[F]oreseeability is commonly proven, or a question of fact is raised, when a party establishes that the type of tortious conduct involved is a well-known industry hazard." *Id.*  To determine whether an

---

which already have been eliminated as a basis for liability under the entire-tort rule.  *See* ECF No. 69 at 38; ECF No. 81 at 20–21.

employee's conduct occurred within the work-related limits of time and place, courts usually "consider whether the alleged conduct occurred on the employer's premises, whether the employee had finished working for the day and 'clocked out,' and whether the employee was in that location for job-related purposes." *Cruz v. TMI Hosp., Inc.*, No. 14-cv-1128 (SRN/FLN), 2015 WL 5996383, at *18 (D. Minn. Oct. 14, 2015) (citing *Rau v. Roberts*, 640 F.3d 324, 328–29 (8th Cir. 2011)); *see also Radmer v. OS Salesco, Inc.*, 218 F. Supp. 3d 1023, 1033–34 (D. Minn. 2016). When the alleged conduct is negligent, courts consider two more factors: (1) whether the "conduct was to some degree in furtherance of the employer's interests"; and (2) whether the "employee was authorized to perform the type of conduct." *Snilsberg*, 614 N.W.2d at 745.

Plaintiffs allege facts plausibly showing that the tortfeasors' alleged acts and omissions occurred within the scope of their employment. The only meaningful dispute as to this element concerns whether the alleged torts related to duties of the clergy. The Holy See argues that Plaintiffs have not alleged that it "had a duty of care or prior knowledge that [clergy] posed a danger to minors." ECF No. 69 at 38–39, 71–73. But the Complaint includes many allegations showing that the Holy See was aware of a sexual-abuse problem within the Church and that it was foreseeable to the Holy See its clergy might act to conceal sexual abuse or fail to act in response to abuse committed by priests. *See* Compl. ¶¶ 53–60, 62–77, 82–99, 105–45. Plaintiffs also allege facts supporting a plausible inference that the Holy See (or at least its bishops) knew or should have known specifically of Wehmeyer and Adamson's propensity to commit sexual misconduct before their abuse of Plaintiffs, and that the Holy See knew or should have known how its clergy in those dioceses would

handle allegations of sexual abuse, including the concealment of the misconduct and transferring of those priests. *See id.* ¶¶ 160–75, 185–97, 217–23, 231, 237–43. As for any alleged negligence, Plaintiffs allege facts plausibly showing that clergy acted both in the Holy See's interests and pursuant to its directives. *Id.* ¶¶ 47–48, 59–60.

*

If the analysis thus far were all the FSIA required, Plaintiffs' claims would go forward, though pared down from what is alleged in the Complaint. Plaintiffs would proceed to discovery with damages claims arising from tortious acts committed exclusively in the United States by Roman Catholic clergy. One could reasonably anticipate that discovery would focus on the employment-status question. Plaintiffs would have no claims for injunctive relief. And Plaintiffs could not rely on conduct abroad or impute liability to the Holy See based on the conduct of archdioceses, dioceses, churches, or other organizations or "agents" in the United States. The FSIA immunity analysis requires more, however.

d

As noted, there are two exceptions to the FSIA's tort exception. The tort exception does "not apply to—"

> (A)    any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

> (B)    any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]

42

28 U.S.C. § 1605(a)(5)(A), (B).  Here, the Holy See argues that Plaintiffs' claims fall within subparagraph (A) because they are based upon the Holy See's performance of discretionary functions, *see* ECF No. 69 at 39–46, ECF No. 81 at 21–29, and that Plaintiffs' claims fall within subparagraph (B) because they arise out of misrepresentations, *see* ECF No. 69 at 46–51, ECF No. 81 at 29–31.  These issues will be considered in that order.

i

Courts analyze § 1605(a)(5)(A)'s "discretionary function" carveout "under the principles developed pursuant to the Federal Tort Claims Act's ("FTCA") discretionary function exception," 28 U.S.C. § 2680(a), as the language of the FTCA provision is identical to § 1605(a)(5)(A).  *See Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987).  To answer whether a plaintiff's claims fall within the exception, a court considers: (1) whether the conduct at issue is discretionary, meaning it involves "an element of judgment or choice" and (2) whether the judgment or choice is of "the kind that the discretionary function exception was designed to shield."  *Croyle by & through Croyle v. United States*, 908 F.3d 377, 381 (8th Cir. 2018) (internal quotation marks and citations omitted); *see also United States v. Gaubert*, 499 U.S. 315, 322–23 (1991).  The first prong is not satisfied, and therefore the exception does not apply, when a "statute, regulation, or policy specifically prescribes a course of conduct for an employee to follow."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (reasoning there is no discretion to be protected in that context).  If "a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the

regulation." *Gaubert*, 499 U.S. at 324.  "If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy."  *Id.*  Under the second prong, a judgment or choice is of the kind intended to be protected by the exception if it is "susceptible to policy analysis, regardless of whether social, economic, or political policy was ever actually taken into account."  *Demery v. U.S. Dep't of Interior*, 357 F.3d 830, 833 (8th Cir. 2004).  For a complaint to survive a motion to dismiss, it must allege facts plausibly supporting a finding that the challenged actions are not within the discretionary function exception.  *See Gaubert*, 499 U.S. at 324–25; *see also GLJ, Inc. v. United States*, 505 F. Supp. 3d 863, 871 (S.D. Iowa 2020).

Doe and *O'Bryan* addressed this issue, reaching different results.  In *Doe*, the Ninth Circuit held that the plaintiff's claims against the Holy See for negligent retention, supervision, and failure to warn were based upon the Holy See's exercise of discretionary functions.  557 F.3d at 1083–85.  In considering the first prong of the analysis, the court noted that the plaintiff "refer[red] vaguely in his complaint to the Holy See's 'policies, practices, and procedures' of not firing priests for, and not warning others about, their abusive acts" and to a "'policy promulgated by the Holy See to cover up incidents of child abuse'" but "nowhere . . . allege[d] the existence of a policy that [was] '*specific and mandatory*' on the Holy See."  *Id.* at 1084.  The court concluded that the plaintiff had not pleaded any claims facially outside the exception, pointing out that he did not "state the terms of th[e] alleged policy, or describe any documents, promulgations, or orders embodying it" nor "in any other way allege that the Holy See's decision to retain [the

priest] and not warn about his proclivities involved no element of judgment, choice, or discretion." *Id.* With respect to the second prong of the analysis, the court found, based on prior Ninth Circuit caselaw, that decisions regarding "whether and how to retain and supervise an employee as well as whether to warn about his dangerous proclivities" were within the types of judgments the discretionary function exception is intended to protect. *Id.* at 1084–85. The court reasoned that the Holy See "might have decided to retain [the allegedly abusive priest] and not to warn his parishioners because it felt that to do otherwise would have harmed the Church's reputation locally, or because it felt that pastoral stability was sufficiently important for the parishioners' well-being, or because low ordination rates or staffing shortages made it necessary to keep [him] on." *Id.* at 1085.

In *O'Bryan*, the Sixth Circuit considered whether the plaintiffs' claims for violating customary international law of human rights, negligence (based on failure to provide safe care, failure to report, and failure to warn), breach of fiduciary duty, and outrage/infliction of emotional distress were based upon discretionary functions. 556 F.3d at 387–88. Unlike the Ninth Circuit in *Doe*, the Sixth Circuit concluded that plaintiffs' claims largely survived. The court reasoned:

> According to the allegations in plaintiffs' complaint, theories of liability premised upon the supervision of the allegedly abusive clergy do not implicate the discretionary function exception to the tortious act exception because the terms of the supervision were not discretionary. According to the complaint, the 1962 Policy [*i.e.*, *Crimen sollicitationis*] "impose[d] the highest level of secrecy on the handling of clergy sexual abuse matters." Plaintiffs contend that this required secrecy prohibited Holy See personnel from, among other things, reporting childhood sexual abuse to government

45

> authorities. *Id.* Thus, following the 1962 Policy cannot, on the
> pleadings in plaintiffs' complaint, be deemed discretionary.

*Id.* at 387. In other words, the court determined (at the motion-to-dismiss stage) that

*Crimen sollicitationis* was a "policy" for purposes of the first prong of the analysis and that

the Holy See's employees' adherence to that policy could not be considered discretionary.

*Id.* The court seems not to have considered the second prong of the analysis. *See id.* at

386–88. Based on its analysis of the first prong, the court allowed the plaintiffs' claims to

go forward to the extent the claims were based on damages caused by U.S.-based clergy's

adherence to the policy "in their supervision of abusive clergy." *Id.* at 387.[14]

I conclude that Supreme Court and Eighth Circuit precedents favor determining that

Plaintiffs' claims as pleaded are entirely within the FSIA's discretionary-act exception to

the tort exception. Several considerations lead to this conclusion.

(1) Recall that, under the first prong of the analysis, the sovereign is protected "if a

regulation mandates particular conduct, and the employee obeys the direction . . . because

the action will be deemed in furtherance of the policies which led to the promulgation of

---

[14]    The *O'Bryan* court nonetheless dismissed some of the plaintiffs' claims. The plaintiffs' claims against the Holy See "as [they] pertain[ed] to the actual promulgation of the [*Crimen sollicitationis*]" did not survive "because the promulgation itself occurred abroad" and therefore did not meet the basic requirements of the noncommercial tort exception. *O'Bryan*, 556 F.3d at 387. For this same reason, the plaintiffs' claims were dismissed to the extent they depended on the Holy See's allegedly tortious conduct abroad. *Id.* at 387–88. Also, the court determined that the plaintiff's failure-to-provide-safe-care claim—which focused on negligent hiring—fell within the discretionary function exception because the *Crimen sollicitationis*, "even according to plaintiffs' allegations, only required Holy See employees not to disclose information regarding sexual misconduct, not to actually hire individuals who had engaged in prior sexual misconduct." *Id.*

the regulation." *Gaubert*, 499 U.S. at 324.  That is precisely what Plaintiffs allege here.

Plaintiffs allege affirmatively and repeatedly that Holy See employees maintained secrecy

surrounding the sexual abuse of children in compliance with Holy See policy.  Plaintiffs

allege the existence of this policy throughout the Complaint.  They allege, for example,

that the Holy See "directed its bishops in the United States to conceal from its parishioners

and the general public the sexual abuse of children committed by priests, bishops, clerics,

agents, and employees." Compl. ¶ 60.  They allege that the *Crimen sollicitationis* "contains

mandatory and specific instructions" requiring secrecy in "the handling of child sex abuse

by clergy," and that "[i]t permits no discretion in the handling of such cases." *Id.* ¶ 85; *see

also id.* ¶ 37 (alleging that the Holy See "provides for no discretion on numerous issues,

and in particular the handling of child sex abuse by clergy"); ¶ 92 ("There is no discretion

given to [the Holy See's] agents in the handling of such cases[.]").  Plaintiffs refer to this

secrecy policy as an "internal law" and allege that clergy who have violated it have been

"ostracized, demoted or fired." *Id.* ¶ 67(e).  In other words—to the extent Plaintiffs claim

to have been injured by the Holy See's secrecy surrounding child sex abuse—the

Complaint alleges that this occurred because Holy See employees were acting in obedience

to Holy See policy.

(2) The Holy See's judgment to implement its secrecy policy is "the kind that the

discretionary function exception was designed to shield."  *Croyle*, 908 F.3d at 381.  Two

Eighth Circuit cases support this conclusion.  The first is *Croyle*.  There, the plaintiff

alleged that the Government was negligent in failing to warn him (and others) of the

sexually abusive propensities of a Catholic priest contracted to conduct Mass at an Army

hospital.  *Id.* at 380.  The plaintiff did not challenge that the Government's decision to retain the priest "without warning of his sexual propensities[]" was a discretionary decision.  *Id.* at 381.  Addressing the second prong of the discretionary function exception, the court explained that "the Government here, in determining whether to warn families or take other protective action, could have balanced public and child safety with the need to protect [the priest's] reputation and confidentiality."  *Id.* at 382.  The court made clear that weighing "safety, reputational interests, and confidentiality" are types of judgments shielded by the discretionary function exception.  *Id.*  Of note, the court cited the Ninth Circuit's *Doe* decision approvingly in reaching its decision.  *Id.*  In addition to *Croyle*, there is *Hinsley v. Standing Rock Child Protective Servs.*, 516 F.3d 668 (8th Cir. 2008):

> In *Hinsley*, Child Protective Services (CPS) placed a minor with a known history of sexually abusing children in a home with three young children, without warning their mother of his past abuse.  *Hinsley*, 516 F.3d at 670–71.  Hinsley sued CPS for negligence, arguing that the discretionary function exception did not apply because "the strong policy interest in preventing child abuse demands that a warning be given."  *Id.* at 673.  [The Eighth Circuit] disagreed, reasoning that CPS's decision "involves an effort to balance the interest in maintaining the confidentiality of [the minor's] past actions against the safety concerns that arise from placing a known sexual abuser in a home filled with children."  *Id.*  Therefore, the discretionary function exception applied.  *Id.*

*Croyle*, 908 F.3d at 382.  The same can be said of the Holy See's secrecy policy alleged in the Complaint.  The Holy See might have weighed parishioner safety, accused clergy's reputational interests, confidentiality concerns, its own reputational concerns, and perhaps other considerations in adopting the secrecy policy.  The Complaint includes no allegations suggesting that the Holy See did not account for these types of social, economic, or political

48

concerns when adopting the secrecy policy.  To the contrary, the Complaint includes allegations to the effect that the Holy See had these kinds of interests in mind when it adopted the policy.  *See* Compl. ¶ 58 (alleging that the intent underlying the secrecy policy is "to harbor and protect its abusive priests, clerics, bishops, archbishops, cardinals, agents, and employees from public disclosure and prosecution, in order to maintain the Supreme Pontiff's rightful claim of control and thereby ensure that its parishioners, followers and financial contributors will keep confidence in the institution, continue to view Defendant Holy See and the Supreme Pontiff as deserving of allegiance, and, therefore, continue to contribute money and property to Defendant Holy See"); ¶ 60 (alleging that the secrecy policy's intent is "to avoid public scandal, and to perpetuate its Christian public image and power to ensure the continued receipt of funds from its parishioners and other financial contributors, all in furtherance of the Defendant Holy See's commercial activities").

(3) In view of these authorities, *O'Bryan* is not persuasive.  Like this case, *O'Bryan* involved a theory that the *Crimen sollicitationis* was a non-discretionary policy requiring secrecy in the handling of clergy sexual abuse matters, and that the plaintiffs' injuries resulted from Holy See employees' compliance with the policy.  556 F.3d at 387. However, in its discussion of the law governing the discretionary function exception, the court seems to have focused only on whether a policy existed.  *See id.* at 384.  The court did not recognize or apply *Gaubert*'s rule that actions taken in obedience to a governmental policy do not trigger liability "because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation."  *Gaubert*, 499 U.S. at 324.  Nor did *O'Bryan* analyze the second prong of the FTCA/FSIA analysis.

(4) Relying on a footnote in *Robles*, Plaintiffs argue that the FSIA's discretionary function exception does not immunize foreign sovereigns from damages claims arising from compliance with the foreign sovereigns' non-discretionary policies. ECF No. 75 at 43–44 (citing *Robles*, 2021 WL 5999337, at *12 n.19). In the relied-on footnote, the *Robles* court determined that "*complying* with a policy is inherently outside the scope of the [FSIA's] discretionary exclusion." 2021 WL 5999337, at *12 n.19 (emphasis added). The court seems to have recognized that showing a policy *violation* is essential to getting past the FTCA's discretionary function exception. *Id.* The court, however, attributed the violation requirement exclusively to the first clause of the FTCA's discretionary function exception. *Id.* This first clause provides that the Government is not liable for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid[.]" 28 U.S.C. § 2680(a). The *Robles* court noted that the FSIA lacks a similar provision. 2021 WL 5999337, at *12 n.19. This approach is not persuasive. The quoted FTCA language covers conduct that might comply with a statute or regulation just as it covers conduct that might violate a statute or regulation. In other words, based on its text, the clause should not be *the* source of a rule requiring an FTCA plaintiff to show a policy violation to negate the discretionary function exception. *Gaubert* confirms this understanding. There, the Court gave no indication that it was relying on this clause to rule that "if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324.

50

(5) Plaintiffs argue that "courts have declined to find a sovereign's conduct discretionary where that conduct offends basic 'precepts of humanity,'" and they "urge the Court to recognize the reprehensible consequence of Defendant's policies and find that the actions of Defendant and its employees are not discretionary." ECF No. 75 at 46–47. To support this argument, Plaintiffs cite two cases in which federal district courts held that the FSIA did not immunize foreign sovereigns accused of murdering individuals in the United States, *Liu v. Republic of China*, 642 F. Supp. 297 (N.D. Cal. 1986) and *Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980). It would be a mistake to apply these cases' shared rationale here. The cases are materially different from this case. Neither case involved consideration of a policy. *See Liu*, 642 F. Supp. at 303–05; *Letelier*, 488 F. Supp. at 668–73. And both cases concerned only assassinations—that is, in neither case did a plaintiff seek damages resulting from a cover-up or other conduct occurring as part of a defendant sovereign's response to the assassinations. *See Liu*, 642 F. Supp. at 299; *Letelier*, 488 F. Supp. at 665–66. Here, by contrast, the issue is not whether the abuse Plaintiffs suffered was discretionary, but whether the Holy See's secrecy policy brings certain of Plaintiffs' claims within the discretionary function exception.

(6) Plaintiffs argue that, if they must plead a policy violation, the fact that child sex abuse and a failure to report it violate innumerable state laws and customary international law should count. ECF No. 75 at 47. I do not agree. The FSIA's discretionary function exception cares about whether a foreign sovereign has violated the *foreign sovereign's* mandatory statutes, regulations, or policies. That is what makes an injury-causing act non-

discretionary under the FSIA.  Whether a foreign sovereign violated state tort law might as well be presumed.  (That is why the sovereign seeks immunity.)

(7) At their core, Plaintiffs' arguments seem directed at showing that the Holy See's policy of secrecy regarding clergy sex abuse was appalling policy.  Many would agree with that assertion.  And there is no doubt Plaintiffs and others like them rightly claim that the secrecy policy made the abuse they suffered and survived possible.  The problem is that the FSIA's discretionary function exception does not call on or enable a federal court to examine the wisdom or reasonableness of a foreign sovereign's policy.  The policy counts, not because it is rational or virtuous, but so long as the choices it reflects were "susceptible to policy analysis, regardless of whether social, economic, or political policy was ever actually taken into account."  *Demery*, 357 F.3d at 833.  The Holy See's secrecy policy clears that low bar.  *See Croyle*, 908 F.3d at 382; *Hinsley*, 516 F.3d at 673.

\*

There might be room for misunderstanding, but I conclude that the discretionary function exception's applicability here means that Plaintiffs' Complaint should be dismissed in its entirety.  Though some cases reflect a claim-by-claim approach to applying the exception, *see, e.g.*, *Doe*, 557 F.3d at 1085, Plaintiffs' Complaint here is based entirely on the theory that the Holy See's secrecy policy resulted in child sex abuse, including the abuse Plaintiffs suffered.  *See* Compl. ¶ 101 ("Plaintiffs were harmed as a result of the Defendant Holy See's practice and policy of not reporting suspected child abuse to law enforcement officials and requiring secrecy of all its agents who received reports of abuse.").  It is true that one might hypothesize a different factual basis for some of

52

Plaintiffs' claims.  Perhaps, for example, Plaintiffs might have alleged that the supervision of Wehmeyer was negligent for reasons not connected to the Holy See's secrecy policy. But the Complaint does not identify facts supporting a distinct theory.  Plaintiffs' briefing confirms this understanding of the Complaint.  Plaintiffs tether their claims to the Holy See's secrecy policy.  *See, e.g.*, ECF No. 75 at 31 ("Plaintiffs allege numerous, concrete examples of Defendant's American employees' tortious conduct in compliance with Defendants' mandatory policies of secrecy in matters of child sex abuse, including but not limited to *Crimen*[.]"); *id.* at 41 ("Plaintiffs allege that Defendant, by and through its employees, acted negligently in response to and in overseeing the conduct of its employees, namely perpetrator priests.  The negligent conduct is premised on compliance with and implementation of Defendant's policies and procedures for responding to sexual misconduct by clergy.").  Plaintiffs do not suggest that some of their claims, or parts of them, might survive if the discretionary function exception were found to apply.  *See id.* at 27–35.  The applicability of the discretionary function exception thus means there is not subject-matter jurisdiction over any part of Plaintiffs' Complaint.

ii

If the discretionary function exception did not divest the court of subject-matter jurisdiction over Plaintiffs' claims, the misrepresentation exception would.  A foreign sovereign retains its immunity from suit for "any claim arising out of . . . misrepresentation . . . ."  28 U.S.C. § 1605(a)(5)(B).  As with the discretionary function exception, federal courts look to the FTCA to interpret the misrepresentation exception because it is modeled after a similar exception in that statute.  *See* 28 U.S.C. § 2680(h); *Doe*, 557 F.3d at 1085

n.10.  The misrepresentation exclusion is understood to "cover[] both acts of affirmative misrepresentation and failure to warn."  *Doe*, 557 F.3d at 1085 n.10; *see also Janowsky v. United States*, 913 F.2d 393, 396 (7th Cir. 1990) (stating the exclusion "encompasses claims arising out of negligent, as well as willful, misrepresentation" (citing *United States v. Neustadt*, 366 U.S. 696, 702 (1961))).   When applying the exception, courts "look beyond [the complaint's] characterization to the conduct on which the claim is based." *Mt. Homes, Inc. v. United States*, 912 F.2d 352, 356 (9th Cir. 1990); *see also Metz v. United States*, 788 F.2d 1528, 1534 (11th Cir. 1986) ("[A] cause of action which is distinct from one of those excepted under [the statute] will nevertheless be deemed to 'arise out of' an excepted cause of action when the underlying governmental conduct which constitutes an excepted cause of action is 'essential' to plaintiff's claim."); *Lambertson v. United States*, 528 F.2d 441, 443 (2d Cir. 1976) ("[A] court must look, not to the theory upon which the plaintiff elects to proceed, but rather to the substance of the claim which he asserts.").

Again, *Doe* and *O'Bryan* provide guidance on this question, though the courts reached somewhat different results.  In *Doe*, because the Ninth Circuit determined that the discretionary function exception barred the plaintiff's failure-to-warn-claim, the court was not required to consider the claim under the misrepresentation exception.  557 F.3d at 1085.  The court nonetheless noted that the misrepresentation exception would bar the claim.  *Id.* at n. 10 ("[W]e have held that government officials' failure to warn about an individual's dangerousness, which ultimately led to sexual abuse of a minor, comes within the misrepresentation exclusion." (citing *Lawrence v. United States*, 340 F.3d 952, 958 (9th Cir. 2003))).  In *O'Bryan*, by contrast, the Sixth Circuit concluded that "at this stage of the

54

litigation, the plaintiffs' claims of violation of customary international law of human rights, negligence, and breach of fiduciary duty should not be dismissed for arising out of misrepresentation or deceit." 556 F.3d at 388 (quotation omitted). Despite having characterized the plaintiffs' remaining negligence claims as failure-to-report or failure-to-warn claims in its analysis of the discretionary function exception, the court reasoned in the context of the misrepresentation exception that the plaintiffs' claims were "not best characterized as stemming directly from the misinformation disseminated by the Holy See," but were "more akin to claims of negligent supervision[,] as employees of the Holy See [were] alleged to have provided inadequate supervision over those under its care." *Id.* The court dismissed two causes of action pleaded as "deceit" and "misrepresentation" for falling within the exclusion. *Id.*

If the dispositive question is whether a claim is based on the Holy See's failure to warn of Wehmeyer, Adamson, and other clergy's dangerousness, then Plaintiffs' claims are within and barred by the misrepresentation exception. Again, the theory underlying the Complaint is that "Plaintiffs were harmed as a result of Defendant Holy See's practice and policy of not reporting suspected child abuse . . . and requiring secrecy of all its agents who received reports of abuse." Compl. ¶ 101; *see* ECF No. 75 at 41 (characterizing Plaintiffs' claims as premised on the Holy See's secrecy policies). It is difficult to understand how a policy forbidding disclosure might be different from a failure to warn for this exception's purposes. Plaintiffs seem to argue that the misrepresentation exception does not apply to negligent conduct, but that is not correct. *See Janowsky*, 913 F.2d at 396 (citing *Neustadt*, 366 U.S. at 697–98). Plaintiffs also rely on the split results in *O'Bryan* and other cases

where courts dismissed some claims but not others, suggesting that all of the claims here are like the non-dismissed claims in those cases.  This is not persuasive because all of the Complaint's claims here are grounded in the Holy See's secrecy policy.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that:

1.   Defendant Holy See's Motion to Dismiss [ECF No. 67] is **GRANTED**.

2.   Plaintiffs' Complaint is **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  August 14, 2023                          s/ Eric C. Tostrud
                                                Eric C. Tostrud
                                                United States District Court